**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

REGINA A. WILLIAMS,

               Plaintiff,

v.                                      CIVIL ACTION NO.  5:09-cv-00049

BASIC CONTRACTING SERVICES, INC.,

               Defendant.

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion for Summary Judgment of Defendant Basic Contracting Services, Inc. (BCS) [Docket 35], which addresses all the claims of Plaintiff Regina A. Williams (Williams) in the original complaint (Docket 1-1).  Williams filed a response [Docket 38][1], and BCS replied [Docket 40].  Following this Court's order granting Williams' Motion to File Amended Complaint (Docket 85) and the filing of the Amended Complaint (Docket 86), BCS filed a Supplemental Motion for Summary Judgment [Docket 87], responding to the newly added cause of action.  Williams filed a response [Docket 93], and BCS replied [Docket 104].  Subsequent thereto, BCS filed a Motion for Leave to File Supplemental Brief [Docket 105], based on newly acquired evidence.  A response was received from Williams [Docket 106], and a Reply was filed by BCS [Docket 107][2].  The matter being fully briefed, the issue is ripe and ready for determination.

---

[1] The Court **GRANTS** Williams' Motion to Exceed Page Limit [Docket 39].

[2] The Court **GRANTS** BCS's Motion for Leave to File Supplemental Brief [Docket 105]. The Court also **GRANTS** BCS's Motion for Leave to Apprise the Court of New Case Law from the
(continued...)

## I. FACTUAL BACKGROUND

Williams is a former employee of BCS.  (Docket 38 at 1.)  Although she began working as a maid at the Mine Safety and Health Administration (MSHA) Mine Academy in Beckley, WV in 1997, BCS did not take over the contract to perform the work until 2001.  (*Id*.)  Williams continued to work for BCS until October 3, 2007.  (Docket 36 at 2.)

At some point during her employment, Williams became concerned regarding BCS's billing practices.  In particular, she questioned whether it was appropriate for BCS to sign in some employees as both janitors and maids, and then assign them to clean rooms at the Academy, thereby decreasing the number of personnel needed to accomplish the work for which BCS was responsible under the government contract.  (Pl. Exh. A at 87.)  Williams' complaint was in essence one of double-billing—that BCS was claiming to complete the work required by the contract, but doing so with fewer people than necessary.  (*Id*.)  Thereafter, Williams obtained a copy of the BCS's government contract, which validated her concerns.  (*Id*. at 34-36.)

Following this discovery, but prior to her termination, Williams spoke with several people regarding the double billing issue, although she did not file a formal complaint.  In particular, Williams spoke several times with Janet Rose, the lead maid.  (*Id*. at 38, 57-58.)  Additionally, she spoke with Pat Brady, the superintendent of the Mine Academy regarding the alleged improper billing practices, and was told that he could not get involved.  (*Id*. at 60, 62-63, 64.)

On September 11, 2007, Williams spoke with Pat Smith, an MSHA employee and former Contracting Officer's Technical Representative for the government contract.  (*Id*. at 85-88.)  During

---

[2](...continued)
Court of Appeals for the Fourth Circuit [Docket 105].

this conversation, Williams asked several questions regarding the BCS government contract (Def. Supp. Exh. 6 at 27-28), and at least a portion of that conversation was reported to BCS management (Pl. Supp. Exh. 9 at 105).

Beginning in September 2007[3], Williams was suspended from work on two separate occasions. On September 21, 2007, Williams allegedly went to customers with complaints regarding BCS, and on September 24, 2007, Williams was suspended based on improper cleaning of her assigned rooms. (Def. Exh. 5 at 5.) On September 24, 2007, Williams received a suspension letter with the following explanation:

> Insubordination: You did not follow the proper chain of command and went directly to our customer with complaints. Your actions could cause harm to this Company by making false statements without allowing anyone in this Company to address your concerns. You are cautioned to bring your concerns up with the proper chain of command in the future.

> Job Performance: You failed to properly clean an assigned room. Upon receiving a complaint from a guest, that led to an inspection of this room, you were then instructed to go clean the same room that you said you had already completed.

(Pl. Exh. B.) After she returned to work, Williams was again sent home on October 1, 2007 based on a pending "room" investigation. (Docket 36 at 5; Docket 38 at 4.) Finally, on October 3, 2007, Williams was terminated. (Pl. Exh. E.) The reason for the seemingly sudden increase in discipline is a matter of dispute between the parties. Williams claims that her conversation with Pat Smith was overheard by an acting project manager, Debbie DeLuca, who then reported them to Terri McNeely-Redden. (Docket 38 at 3.) Thereafter, Williams received the suspension for insubordination and

---

[3] In its interrogatory responses, BCS points to two prior incidents of workplace discipline, one in 2001 and a second in 2006. (Def. Exh. 5 at 4-5.) The 2001 incident was based on Williams speaking disrespectfully to her supervisor, and Williams received an oral reprimand. In 2006, Williams received a written reprimand for failing to properly clean assigned rooms, misusing company time, spreading rumors about BCS, and her inability to get along with coworkers.

job performance.  (*Id*. at 3-4.)  Not surprisingly, BCS provides a different explanation for the disciplinary action.  BCS cites to a history of complaints regarding Williams' work performance, beginning in 2001, and culminating in 2007, when Williams filed a union grievance.  (Docket 36 at 3-4.)  Her suspension occurred, says BCS, because Williams was heard complaining to the customer regarding her work conditions.  (*Id*. at 5.)

Williams originally filed suit against BCS in the Circuit Court of Raleigh County, alleging a violation of 41 U.S.C. § 265 (contractor employees' protection from reprisal for disclosure of certain information), wrongful discharge, and intentional infliction of emotional distress. (Docket 1-1.)  The case was later removed to federal court.  (Docket 1.)  Subsequently, Williams moved for, and the Court granted, leave to amend her complaint and add an additional cause of action for retaliatory discharge in violation of the Federal False Claims Act, 31 U.S.C. § 3730(h).  (Dockets 45, 85, 86.)

## II.  LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. That rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c)(2).  Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."  *The News and Observer Publ. Co. v. Raleigh-Durham Airport Authority*, 597 F.3d 570, 576 (4th Cir. 2010).  When construing such factual issues, it is well established that the Court must view the evidence "in the light most

favorable to the [party opposing summary judgment]." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial." *Id.*

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff." *Id.* at 252.

### III.  ANALYSIS

The Court will first address Williams' two federal causes of action, and then turn to the two claims Williams raises under West Virginia state law.

### A.  Cause of Action Pursuant to 41 U.S.C. § 265

BCS first argues that no private cause of action exists under 41 U.S.C. § 265. Subsection (a) of that statute provides:

> An employee of a contractor may not be discharged, demoted, or otherwise
> discriminated against as a reprisal for disclosing to a Member of Congress or an

5

> authorized official of an executive agency or the Department of Justice information relating to a substantial violation of law related to a contract (including the competition for or negotiation of a contract).

41 U.S.C. § 265(a).  The statute outlines a procedure for reporting and investigating alleged breaches of § 265(a).  The procedure involves submitting a complaint to the Inspector General of the executive agency, who, upon finding the action non-frivolous, will investigate the incident and prepare a report.  41 U.S.C. § 265(b).  If the employer contractor has violated subsection (a), the head of the executive agency may require the employer contractor to remedy the situation and the wrongful conduct.  41 U.S.C. § 265(c).

As properly pointed out by BCS, the statute contains no explicit means of private enforcement.  BCS argues that the presence of the statute's savings clause, § 265(d), "affirmatively indicates that no private right exists."  (Docket 36 at 12.)  In support of this argument, BCS cites two cases from the Northern District of Texas that reached the same conclusion.  *See Hammack v. Automated Info. Mgmt.*, 981 F. Supp. 993 (N.D. Tex. 1997) (finding that "the statute indicates that no private right exists thereunder" by virtue of the savings clause)*; Prime Lending v. Moyer*, 2004 WL 1194461 (N.D. Tex. May 28, 2004) (relying on *Hammack* to conclude that "no private cause of action is available").

This Court is not persuaded by *Hammock* and *Prime Lending*.  That the statute preserves external causes of action does not in any way answer the question of whether a private cause of action is created under the statute.  Rather, it does exactly what it is designed to do: it "saves," or preserves, any other causes of action or avenues of relief available in addition to the new relief provided by the statute.  It does not rule out the possibility of an implied cause of action.  As

Williams notes, "It is completely silent on the question of whether 41 U.S.C. § 265 does or does not create a private right of action."

Because there is no explicit guidance in the statute on this point, nor any persuasive case law upon which to rely, the Court must analyze whether an implied cause of action does exist. To decide if a private cause of action is created implicitly by a statute, the Court should consider congressional intent. *See Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979). In *Touche Ross*, the Supreme Court rejected a four-part analysis for finding implied causes of action in favor of looking to what Congress intended to do. "The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action. Indeed, the first three factors discussed in *Cort* [*v. Ash*, 422 U.S. 66 (1975)]—the language and focus of the statute, its legislative history, and its purpose—are the ones traditionally relied upon in determining legislative intent." *Id.* at 575-76.

Williams fails to persuade the Court that Congress intended to create a private cause of action for this statute. Although Williams is certainly one of the class the statute was intended to protect, the statute explicitly provides aggrieved parties an avenue to address violations. Creating a private cause of action would not necessarily be consistent with the statute, because allowing a private alternative to enforce the statute could undermine the scheme explicitly outlined by Congress, and possibly inhibit the Government's ability to investigate alleged violations.

Williams can point to no legislative history indicating that Congress intended to remedy improper contractor employer behavior by private litigation. In fact, Williams' own citations to the Congressional record undercut that conclusion. Her explanation of the statutory scheme, which discusses "how important it is that the federal government receive good value for its money, treat contractors fairly, etc." (Docket 38 at 20 (citing to Congressional Record September 20, 1994;

Congressional Record, August 23, 1994)), suggests that the primary beneficiary of this statutory scheme is the Government.  The Inspector General is employed to root out problems with contracts by, among other things, reviewing tips that employees presumably feel more free to offer.

Perhaps the strongest argument against Williams' position is that Congress chose to enact a statutory scheme that did not include a private cause of action.  "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979).  In the absence of any indication that Congress intended to create a private remedy, the Court cannot ignore the presence of a remedy made explicitly available to Williams via the statute itself.  "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO*, 451 U.S. 77, 97 (1981).  That presumption arises here, as § 265(b) provides a method for redressing grievances under this section.

Williams' final argument is that, even if there is no private cause of action, "this case presents a particularly compelling situation."  (Docket 38 at 22.)  According to the briefing, Williams did pursue the explicit statutory remedies laid out in § 265(b), but her complaint has not been investigated and she thus has been unable to get the relief she requests.  Although the Court is sympathetic to Williams' situation, causes of action generally do not arise out of judicial sympathy, and Williams has provided no authority for her cause of action.  Even if Williams has availed herself of the statutory remedies, her desire for an expeditious outcome is an insufficient reason to depart from long-standing rules of statutory construction and create a cause of action.  To

8

create such a precedent could be damaging to the statutory scheme and potentially undermine what Congress sought to accomplish by creating the enforcement method that it did.  The Court declines this invitation.

Because the Court finds as a matter of law that no cause of action exists, there is no need to address the factual challenges raised by BCS.  Based on the above analysis, the Court **GRANTS** summary judgment in favor of Defendant BCS with respect to Plaintiff Williams' cause of action for relief pursuant to 41 U.S.C. § 265.

### B.  Cause of Action for Discharge in Violation of Federal False Claims Act

Williams' second federal cause of action alleges wrongful discharge in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729-33.  BCS raises a factual challenge to the claim, arguing that Williams has presented insufficient evidence for each element of the cause of action to bring the issue before a jury.

As laid out in the memorandum opinion and order of this Court on April 30, 2010 (Docket 85), the elements of a retaliatory discharge are: (1) an employee took acts in furtherance of a *qui tam* suit [i.e. engaged in "protected activity"]; (2) the employer knew of these acts; and (3) the employer discharged the employee as a result of these acts.  *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 867 (4th Cir. 1999) (citing *Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 914 (4th Cir. 1997)).

### 1.  Acts in Furtherance of a Qui Tam Suit

BCS's first challenge is to William's alleged investigative activities.  Specifically, BCS claims that Williams' activities did not rise to the level of "protected activity" sufficient to allow the issue to be presented to a jury. "Protected activity" includes "initiat[ing], testif[ying] for, or

assist[ing] in the filing of a *qui tam* action," *Zahodnick*, 135 F.3d at 914, but also covers "investigation for" an action to be filed. *Eberhardt*, 167 F.3d at 867. As it is undisputed that no actual *qui tam* case was filed, the parties have focused their attention on Williams' gathering of information.

Before the Court can properly evaluate BCS's challenge to the first element, the Court must explore what level of investigation rises to the level of "acts in furtherance of a *qui tam* suit." Fourth Circuit case law offers some anecdotal boundaries. "[A]n employee need not have actually filed a *qui tam* suit or even known about the protections of § 3730(h) in order to engage in protected activity." *Eberhardt*, 167 F.3d at 867. In fact, the Fourth Circuit has held that "litigation need only be a 'distinct possibility,' and that the action "reasonably could be filed." *Id*. No protected activity occurs, however, when a plaintiff "report[s] his concern of a mischarging to the government to his supervisor." *United States ex rel Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, --- F.3d ----, 2010 WL 2794369 at *10 (4th Cir. July 16, 2010). Likewise, informing a supervisor of a problem and seeking "confirmation that a correction was made" is insufficient to satisfy the first element of a retaliatory discharge claim. *Zahodnick*, 135 F.3d at 914.

The case of *United States ex rel. Yesudian v. Howard University*, 153 F.3d 731 (D.C. Cir. 1998) is instructive.[4] In examining the first element, the court identifies "Congress' intent to protect employees while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." *Id*. at 740 (citing *Neal v. Honeywell, Inc.*, 33 F.3d 860, 864 (7th Cir. 1994)). There is no requirement that a potential plaintiff have assimilated all of the evidence by the

---

[4] *Yesudian* is not binding precedent in its own right, but it is cited with approval by the Fourth Circuit's *Eberhardt* decision.

time the alleged retaliation occurs, nor is it necessary that the employee even know that the investigation could lead to a claim under the False Claims Act.  *Id.* at 740-41.  While "[m]ere dissatisfaction with one's treatment on the job is not, of course, enough," no requirement exists that an investigation be fully completed, or that a suit be consciously contemplated.  *Id.*

Against this framework, the Court now considers Plaintiff's allegations.  Based on the wide range of activities that might permissibly constitute "acts in furtherance," Williams has certainly raised a sufficient issue of fact to survive summary judgment with respect to this element.  She searched for and located a copy of the BCS government contract. (Pl. Supp. Exh. 1 at 58-59.)  She also spoke with numerous people at the Academy, including lead maid Janet Rose (*Id.* at 57), Mine Academy superintendent Pat Brady (*Id.* at 58, 60), Jean Howerton (*Id.* at 64), and Pat Smith (*Id.* at 85-88).  Williams asserts that these conversations all involved asking questions regarding the billing practices of BCS and the propriety of the billing.  The conversations did not involve simply expressing dissatisfaction with the amount of work she was asked to do, nor was this type of fact-gathering otherwise a part of Williams' job.  *Cf. Yesudian*, 153 F.3d at 740; *X Corp. v. Doe*, 816 F. Supp. 1086, 1095 (E.D. Va. 1993).  Moreover, the conversations do not appear to be simply an attempt by Williams to point out a problem and seek confirmation that it was corrected.[5]

These casual conversations with various people at the Mine Academy, each of whom may have been able to provide key information to a budding investigation, certainly fall within the legal parameters for "acts in furtherance" of a *qui tam* suit.  Although BCS may have a different

---

[5] Pat Smith's recollection of the conversation with Williams is particularly telling in this respect.  When describing the conversation between the two, Smith describes it as consisting of "some questions about the contract." (Def. Supp. Exh. 6 at 27.) "[T]hey were not complaints.  I just took them as questions."  (*Id.* at 28.)

interpretation of these conversations and inquiries, those are arguments properly presented to a jury. Williams has provided the Court with sufficient evidence that she was conducting an investigation and thus can satisfies the first element of the cause of action.[6]

### 2. Defendant's Knowledge of Plaintiff's Activities

Next, BCS argues that, even assuming Williams did conduct an investigation, it had no way of knowing about the investigation.  BCS points out, and the Court agrees, that there are only two direct ways in which BCS could have learned of Williams' investigation: either because the conversation between Williams and Pat Smith on September 11, 2007 was relayed to BCS management by Debbie DeLuca, or the October 1, 2007 email from Cheryl Ramsey to Charlie Ross put BCS on notice of Williams' investigations.[7]

---

[6] Although not properly admissible evidence for consideration by the Court in deciding summary judgment, a report summarizing the findings of an investigation into the incident initiated by Congressman Nick J. Rahall II reaches similar conclusions:

> We have established that prior to her termination Ms. Williams did not formally complain to BCSi management or the MSHA COTR regarding theft, intoxication of BCSi employee(s), or potential contract violations.  However, it appears that she did discuss such issues with BCSi and MSHA employees—and that these discussions were witnessed or relayed to BCSi management.

(Pl. Supp. Exh. 3 at 6.)  The Court is cognizant that this evidence, while it has been authenticated, may not be properly admitted, absent Williams' ability to lay a foundation for it, but the report nonetheless reaches factual findings on many of the same questions facing this Court.  As such, it certainly reaffirms the Court's conclusion that reasonable minds could reach conclusions favorable to Williams on the basis of the evidence presented.

[7] The Court also notes that a third possible avenue exists, specifically that lead maid Janet Rose could have conveyed the information to her BCS superiors following inquiries from Williams.  (*See* Pl. Supp. Exh. 1 at 57; Pl. Exh. F at 8.)  This provides another possible direct link between Williams' investigation and BCS, as Williams was gathering information directly from a BCS employee.  However, the parties do not identify this, nor is any evidence presented to either support or refute it.  Therefore, the Court will give it no further consideration.

The Court agrees with BCS that the Ramsey email is insufficient to get Williams past summary judgment. That email (Pl. Exh. C) references other concerns Williams had, about matters such as employees stealing items from the Mine Academy or sleeping on the job, but makes no mention whatsoever of Williams' investigation into BCS's allegedly improper billing practices. Hence, this email does not show that Cheryl Ramsey conveyed Williams' double billing concerns to upper management at BCS.

The conversation from September 11, 2007, however, is enough to allow Williams to survive summary judgment with respect to this second element. Taking all evidence in the light most favorable to the plaintiff, Williams can demonstrate that BCS had notice of her questions and investigation. That Williams spoke with Pat Smith on September 11, 2007 is undisputed by either party. (*See* Pl. Supp. Exh. 1 at 85-88, Pl. Supp. Exh. 2 at 48, Def. Supp. Exh. 8 at ¶ 3.) It is also undisputed that Debbie DeLuca overheard at least some portion of that conversation and reported it to BCS management. (*See* Def. Supp. Exh. 8 at ¶ 7; Pl. Supp. Exh. 9 at 105.)

The contents of the original conversation as well as what Debbie DeLuca relayed to BCS management are in dispute by the parties. Debbie DeLuca, with whom Williams did not have a particularly good relationship (*see, e.g.*, Def. Exh. 1 Depo Exh. 14), asserts that she did not report Williams discussing the contract or billing issues with Pat Smith. (Def. Supp. Exh. 8 at ¶ 7.) Terri McNeely-Redden, however, indicates that she was told that Williams was asking questions related to the contract and complaining about the amount of work she was required to do. (Def. Supp. Exh. 10 at 48-49.) Moreover, the actions of BCS immediately after Williams spoke to Pat Smith also may color the jury's impression of what Debbie DeLuca told management regarding the conversation. The reaction was not immediate due to Terri McNeely-Redden's vacation, but soon after she

returned, Williams was suspended.  (Pl. Exh. B.)  That suspension lasted through September 27, 2007, and was followed shortly thereafter by Williams' termination on October 3, 2007.  (Pl. Exh. E.)  A reasonable jury could find that the conversation occurred as Williams alleges, that it was reported to BCS management by Debbie DeLuca, and that they reacted with harshness indicative of full knowledge of the conversation as Williams alleges it.

The combination of facts presented at this stage, taken in the light most favorable to Williams, are adequate to survive summary judgment.

### 3.  *Defendant Discharged Plaintiff as a Result*

Finally, BCS contends that it did not discharge Williams as a result of any investigation into the company's billing practices.  Separately, it argues that there was an independent basis for her termination, specifically her poor work performance.  The Court will not dwell long on this element, as it is at its core a factual issue that must be left to the jury.  While the Court acknowledges that BCS has evidence showing that Williams had poor job performance, such evidence does not eliminate the possibility that Williams was terminated for precisely the reason she alleges—because she was investigating allegations of BCS using improper billing practices to defraud the federal government. The very fact that Williams was suspended and ultimately terminated, not simply for poor job performance, but also for "insubordination," suggests that complaints about Williams' poor job performance may have been pretextual.  (Pl. Exh. B, Pl. Exh. D.)  An email from John Morgan dated September 19, 2007 indicates that Williams was to be suspended on September 24, 2007 for insubordination (Pl. Exh. B at 2), but it makes no mention of her failure to properly clean an assigned room, although the suspension notice (Pl. Exh. B at 1) does.  It is at least arguable in the record that the decision to suspend Williams predated any issue with an improperly cleaned room.

14

Moreover, The presence of this information in the record precludes the Court from ruling, as a matter of law, that Williams was fired for reasons other than her investigation into BCS's billing practices.

In conclusion, Williams has demonstrated sufficient facts to allow her retaliation claim to survive summary judgment.  Therefore, the Court **DENIES** BCS's motion for summary judgment with respect to retaliatory discharge in violation of the Federal False Claims Act.

*C.  Cause of Action for Wrongful Discharge*

BCS argues that Williams has failed to identify a West Virginia public policy and thus establish an exception to the at-will employment doctrine.  Williams responds by claiming that inability to bring a private suit pursuant to § 265 does not prevent her from enforcing the general public policy underlying that statute.

The elements of the tort of wrongful discharge, as set forth by the West Virginia Supreme Court of Appeals, are:

> (1) [Whether a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element);
> (2) [Whether d]ismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* elements);
> (3) [Whether t]he plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element); and
> (4) [Whether t]he employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713, 723 (W. Va. 2001).

*1.  Existence of West Virginia Substantial Public Policy*

Although employment under West Virginia law is generally presumed to be at-will and terminable for any cause, *Mace v. Charleston Area Med. Center Foundation, Inc.*, 422 S.E.2d 624, 630 (W. Va. 1992), there are some exceptions.  Notably, "the rule giving the employer the absolute

15

right to discharge an at will employee must be tempered by the further principle that where the employer's motivation for the discharge contravenes some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by the discharge." *Harless v. First Nat'l Bank in Fairmont*, 246 S.E.2d 270, 275 (W. Va. 1978).  Thus, in order to allow the wrongful discharge cause of action to proceed, the Court must be satisfied that Williams' claim is based on a public policy that triggers the exception to at-will employment.

Williams' complaint alleges only generally the public policy upon which her claim rests, specifically that "defendants and their agents have discharged the plaintiff in violation of a substantial public policy." (Docket 1-1 at ¶ 35.) Based on the overall complaint, however, it is clear that Williams alleges that she was fired based on her attempts to alert people to what she perceived to be fraudulent billing practices.  BCS attempts to characterize this claim as one based solely on the public policy enunciated in 41 U.S.C. § 265.  Such a conclusion, while reasonable, is not mandated by the language of the complaint.  Indeed, based on Williams' response to summary judgment, it appears that her claimed public policy is somewhat more general, the policy that "contractors may not discharge employees for reporting contract violations."  (Docket 38 at 23.)

The first step is to decide what qualifies as a substantial public policy for purposes of West Virginia's at-will employment exception.  In *Birthisel v. Tri-Cities Health Services Corp.*, the sources of public policy include: "precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions."  424 S.E.2d 606, 607 (W. Va. 1992).  According to *Feliciano v. 7-Eleven*, that "clear public policy" can be manifested "in a state or *federal* constitution, statute or administrative regulation, or in the common law."  559 S.E.2d 713, 723 (W. Va. 2001) (emphasis added).  The phrasing of this element in *Feliciano* suggests that public policy may be

16

found in a broad range of law, and may be derived from both federal and state law and even the ever-developing common law.

Notably, the Fourth Circuit has held that the Supremacy Clause of the United States Constitution is insufficient to automatically transform all federal law into public policy. "Although federal law can preempt state law under the Supremacy Clause, this in no way implies that federal law automatically defines state policy, or that federal agencies can determine its parameters. . . . [F]ederal policy is enforced by the means Congress specifies, not through state-law wrongful discharge actions." *Szaller v. American Nat'l Red Cross*, 293 F.3d 148, 151 (4th Cir. 2002). However, *Szaller* was decided under Maryland law, and the Fourth Circuit noted no authority in Maryland for using federal regulations to define Maryland public policy. Obviously, West Virginia law is controlling on its own state law claims.

West Virginia law specifically allows for federal statutes as a source for public policy under *Feliciano*.[8] Further, the West Virginia Supreme Court of Appeals has in the past cited approvingly to other courts who have found public policy in federal statutes and regulations. *See, e.g.*, *Kanagy v. Fiesta Salons, Inc.*, 541 S.E.2d 616, 620 (W. Va. 2000) *(*citing *Meury v. Connie Kalitta Servcies/American Int'l Airways, Inc.*, 181 F.3d 102 (6th Cir. 1999) (finding wrongful discharge claim under Michigan law where safety violations were reported to the Federal Aviation Authority); *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859 (Mo. Ct. App. 1985) (upholding wrongful discharge claim based on reporting violation of federal eyeglass testing regulations); *Allum v. Valley Bank*, 970 P.2d 1062 (Nev. 1998) (identifying Nevada public policy where employee refused to process loans

---

[8] At least with regard to the reference to federal law, this passage in *Feliciano* might be considered dicta, but it is nonetheless useful and persuasive in discerning public policy from the viewpoint of the West Virginia Supreme Court of Appeals.

17

in violation of Federal Housing Administration regulations); *Coman v. Thomas Mfg. Co.*, 381 S.E.2d 445, 447 (N.C. 1989) (allowing wrongful discharge suit based on employee's failure to drive in excess of hours permitted by federal Department of Transportation regulations)).  In short, it is evident that West Virginia law authorizes the use of federal law to serve as the basis of a wrongful discharge suit.

"Inherent in the term 'substantial public policy' is the concept that the policy will provide specific guidance to a reasonable person." *Birthisel v. Tri-Cities Health Services Corp.*, 424 S.E.2d 606, Syl. Pt. 2 (1992). Perhaps most indicative of West Virginia's broad view on public policy is *Kanagy*.  There, an at-will employee alleged wrongful discharge based on the public policy embodied in a regulation promulgated by the West Virginia Board of Barbers and Cosmetologists. In particular, the employee was allegedly discharged "for providing truthful information to an Investigator for the Board of Barbers and Cosmetologists, thereby indicating that the employer violated the Board's rules." *Id*. at 617.  The basis of the public policy was to be found in a "Duty to Carry Out Rules, Reporting and Complaints" section of the regulations, which required employees to "assist in carrying out the provisions of this rule by reporting any violation to the Board or any of its duly authorized agents." W. Va. Code of State Regs. § 3-5-3-1.

In an exhaustive review of West Virginia's wrongful discharge litigation, the *Kanagy* court found that the duty to report, although not explicitly prohibiting employer reprisal for compliance, did set forth a sufficiently clear public policy.  "To conclude otherwise would be tantamount to condoning the discharge of an employee for unwillingness to lie to a public official to protect an employer." *Kanagy*, 541 S.E.2d at 623.  In reaching this conclusion, the *Kanagy* court also adopted two principles pronounced by courts in other states.  The first concluded that "employees should not

be discharged because they perform an act that public policy would encourage, or refuse to do that which public policy condemns." *Id.* (citing *Wagner v. City of Globe*, 722 P.2d 250, 256 (Ariz. 1986)).  The second came from Colorado:

> There is no question that the manifest public policy of this state is that neither an employer nor an employee should be permitted to knowingly perpetrate a fraud or deception on the federal or state government.  A corollary of this policy is that an employee, whether at-will or otherwise, should not be put to the choice of either obeying an employer's order to violate the law or losing his or her job.

*Id.* (citing *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 109 (Colo. 1992)).  Although the facts are not exactly identical, allowing Williams to base her wrongful discharge claim on laws which are designed to prevent retaliation against employees who report suspected violations of law places this case well within the heartland and purpose of West Virginia's public policy exception.  Little legal creativity is required to conclude that it would be the substantial public policy of this or any other state to encourage citizens to come forward when a wrong is being done to the government, and then protect that citizen from retaliation.

Further evidence that West Virginia would consider retaliation for whistle-blowing as a violation of "substantial public policy" may be found in its own policies for public employees.  This anti-retaliation provision reads:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee by changing the employee's compensation, terms, conditions, location or privileges of employment because the employee, acting on his own volition, or a person acting on behalf of or under the direction of the employee, makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

W. Va. Code § 6C-1-3(a).  Thus, the state has evidenced a clear public policy that favors employees coming forward to report suspected violations of law and prohibits retaliation for such reporting.

The Court therefore finds that Williams has stated a cause of action for wrongful discharge

sufficient to withstand summary judgment with respect to this legal ground.  As such, the Court

**DENIES** BCS's motion on this point.

### 2. *Facts Supporting Causal Nexus*

Having found that Williams has stated a cause of action based on a substantial public policy

under West Virginia law, the Court must next decide whether Williams has presented sufficient

evidence for this cause of action to be presented to a jury.  In particular, BCS challenges the "causal

nexus" between Williams' complaints and her discharge by pointing out that Williams did not report

her suspicions to certain people, such as project manager Terri Redden or Chief Executive Officer

John Morgan, until after she was terminated.[9]  (Docket 36 at 16.)

Viewing all the evidence presented in this case thus far in the light most favorable to

Williams, the Court finds that there is sufficient evidence that the cause of Williams' termination

was her investigation of and/or complaints regarding BCS's billing practices.  During her deposition,

Williams listed several persons to whom she expressed her concerns about BCS's improper billing

practices, including lead maid Janet Rose (Pl. Depo. at 38, 57-58), Mine Academy superintendent

Mr. Brady (Pl. Depo. at 60, 62-64), and MSHA employee Pat Smith (Pl. Depo. at 85-88).

Williams received a letter from Terri K. McNeely-Redden, indicating that she was being

suspended for, among other things, "Insubordination."  (Pl.'s Exhibit B.) The letter recited: "You

did not follow the proper chain of command and went directly to our customer with complaints."

(*Id.*)  The document does not provide any more specificity regarding the incident of insubordination,

but an email attached to the letter says that Williams "[a]cted unprofessionally by going directly to

---

[9] BCS does not argue that the other elements of a wrongful discharge cause of action are
absent.  As such, the Court need not analyze these elements.

20

the Government personnel at the Academy speaking negatively about supervisors and ultimately BCSi." (*Id.*)

All of this evidence, and all of the evidence supporting her retaliation claim, when put together, presents an adequate factual dispute regarding the reason for Williams' termination to allow this cause of action to proceed to trial.

For the reasons stated above, BCS's motion for summary judgment with respect to Williams' claim for wrongful discharge is **DENIED**.

### D. Cause of Action for Intentional Infliction of Emotional Distress

#### 1. Whether Cause of Action is Barred by Workers' Compensation Law

To attack Williams' first cause of action, in which she seeks damages for intentional infliction of emotional distress (IIED), BCS contends that this claim is barred by the West Virginia Workers' Compensation Act (WCA), W. Va. Code § 23-1-1 et seq. BCS's theory is that the WCA provides immunity for employers from suits such as these, which may be waived in only three narrow circumstances. BCS argues that Williams has failed to demonstrate the necessary intent required to qualify under one of the liability exceptions of the WCA. Williams contends, in essence, that claims regarding discharge of employees, however characterized, are not recognized by the workers' compensation system. Notably, BCS presents no case law from any court concluding that claims for IIED are covered by WCA immunity. Williams' primary response to this argument is that such a proposition has never been recognized in West Virginia case law in the wrongful discharge context. (Docket 38 at 25-26.)

Although the WCA in West Virginia is designed to provide "sweeping immunity from common-law liability for negligently inflicted injuries," *Bias v. Eastern Associated Coal Corp.*, 640

S.E.2d 540, 544 (W. Va. 2006), workers' compensation is designed for employees.  By its very nature, a wrongful termination suit of any variety is concerned with the aftermath of an employee's termination.  Although the Court has been unable to locate any West Virginia state case law that is on point for this issue, a district court in the Northern District of West Virginia has reached the following conclusion:

> The West Virginia Workers Compensation Act is inapplicable to this action.  The West Virginia Workers Compensation Act applies where the alleged injury occurs in the course of and results from the employment.  *See Sydenstricker v. Unipunch Products, Inc.*, 288 S.E.2d 511 (W. Va. 1982); *Personger v. Peabody Coal Co.*, 474 S.E.2d 887, 893 (W. Va. 1996).  Here, the alleged injuries giving rise to [Plaintiff's] intentional infliction of emotional distress/tort of outrage claim allegedly result from the defendants' conduct surrounding [Plaintiff's] dismissal and therefore occurred outside the course of her employment.

*Allman v. Chancellor Health Partners, Inc.*, 2009 WL 1468457 at *8 (N.D. W. Va. May 26, 2009) (Stamp, J.).  This Court finds *Allman* persuasive.

Because Williams' IIED claim is premised on the circumstances leading to her discharge from BCS, this Court concludes that the claim is not subject to the immunity provisions of the West Virginia WCA. The Court, therefore, need not consider whether one of the exceptions to workers' compensation immunity applies.

### 2. Evidentiary Support for IIED Claim

Finally, BCS contends that Williams has failed to present evidence supporting the necessary elements of an IIED claim.  The elements of a claim for IIED, as set forth by the Supreme Court of Appeals for West Virginia, are:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that

the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis v. Alcon Laboratories, Inc.*, Syl. Pt. 3, 504 S.E.2d 419 (W. Va. 1998).

Specifically, BCS challenges Williams on the first and second elements of the cause of action.  First, BCS argues that Williams has provided no evidence that its actions were "atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency."  (Docket 36 at 17.)  Next, BCS claims that Williams has not shown any evidence of BCS's intent to inflict emotional distress, or any reckless action on its part.  Williams fails in her response brief to directly address the issues raised by this portion of BCS's motion for summary judgment, despite devoting considerable verbiage to presenting her theory of the facts of the case.[10]

Nonetheless, it is not difficult for this Court to conclude that Williams has presented adequate facts to survive summary judgment on this point.  As the West Virginia Supreme Court has noted:

> In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. *Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination.*

*Hatfield v. Health Mgmt. Associates of W. Va.*, 672 S.E.2d 395, 404 (W. Va. 2008) (emphasis added).  Thus, rather than deciding whether BCS's actions amount to intentional infliction of

---

[10] BCS does not provide the Court with any case law cites that supports the conclusion that, as a matter of law, Williams' facts are insufficient.  Other than cases establishing the standards, BCS points only to a Fourth Circuit case arising out of the Commonwealth of Virginia, *Lewis v. First Nat'l Bank of Stuart*, 1987 WL 37397 (4th Cir. May 8, 1987).  There, the tort of outrage was not based on West Virginia law, so it is difficult to see how it is applicable.

emotional distress, this Court must only decide whether it would be reasonable for a jury to find that they do.

Despite the lack of argument from Williams, the Court is able to conclude that, as a matter of law, it would be reasonable for a jury to find that the conduct in question in this case is outrageous.  With respect to the first element, and taking all reasonable inferences in favor of Williams, a jury could reasonably conclude that discharging an employee based on her attempts to investigate possible illegal conduct is outrageous conduct that "truly offend[s] community notions of acceptable conduct." *Travis*, 504 S.E.2d at 425.  The second element, that of intent, may very well be proved by BCS's conduct, including the letter citing insubordination and the alleged firing of another individual based on her own investigations. (Pl. Exh. A at 36-37.)  Further, a jury might reasonably discredit the reprimands received by Williams in 2001 and 2006 as being unrelated to Williams' eventual discharge from BCS.  Viewing the facts underlying Williams' retaliation claim in the light most favorable to her, the Court finds summary judgment based on these two elements inappropriate as well.

BCS also makes a passing comment that "Plaintiff has not identified or presented any evidence of any objective damages that she has sustained as a result of the alleged emotional distress inflicted upon her by Defendant's actions." (Docket 36 at 18.)  The Court interprets this statement as an attack on Williams' evidence relating to the third and fourth elements of the offense, specifically, that Williams suffered emotional distress and that the distress was so severe that no reasonable person could be expected to endure it.  In this case, the Court is unable to construct an argument in support of Williams' pleading.  Nowhere in the briefing has Williams identified any unusually severe symptoms,  nor has she provided any argument that a reasonable person should not

24

be expected to endure those symptoms.  The Court is sympathetic that Williams may have suffered an adverse emotional reaction following her discharge, but that is usually the case for persons who are fired.  Nothing has been presented to even suggest that the effects on Williams were more severe or more onerous than those suffered by any person whose employment is terminated.  Hence, although the conduct itself may be outrageous, Williams' claim fails on the third and fourth elements.

For this reason, the Court **GRANTS** Defendant's motion for summary judgment with respect to William's claim for intentional infliction of emotional distress.

### E.  Prematurity of Summary Judgment

Finally, the Court must address Williams' rebuttal argument that summary judgment is premature.  Williams has presented an affidavit listing discovery that still needs to be completed, including payroll and billing records, as well as an outstanding Freedom of Information Act request from the Mine Safety and Health Administration.  (Docket 38-1.)  BCS responds by pointing out that discovery has closed, and that the discovery still outstanding is not relevant to the issues raised in summary judgment.

Discovery in this case closed on November 15, 2009.  (Docket 27.)  The deadline set for summary judgment briefing was December 1, 2009, which is when BCS filed its motion for summary judgment.  (*Id.*)  Williams has filed no motions to compel, nor has she sought leave to supplement her summary judgment response in the months since her response was filed.

Thus, it is the Court's finding that BCS's motion was not premature.  Further, the Court finds that Williams has waived her right to object on this basis because she failed to seek relief from the court, in the form of either motions to compel or filing supplemental briefing.  Finally, based on the

rulings above that find sufficient facts in the record to allow Williams' second and third causes of action to proceed, the Court is satisfied that Williams has suffered no harm, and the additional briefing time would be unnecessary.  As such, the Court rejects Williams' argument that summary judgment is premature in this case.

### III.  CONCLUSION AND ORDER

For the reasons stated above, BCS's Motion for Summary Judgment [Docket 35] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. With respect to Williams' first cause of action, for intentional infliction of emotional distress, BCS's Motion is **GRANTED**;

2. With respect to Williams' second cause of action, for wrongful discharge, BCS's Motion is **DENIED**;

3. With respect to Williams' third cause of action, for violation of 41 U.S.C. § 265, BCS's Motion is **GRANTED**;

4. With respect to Williams' fourth cause of action, for retaliatory discharge in violation of the Federal False Claims Act, BCS's Motion [Docket 87] is **DENIED**.

**IT IS SO ORDERED.**

26

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:          August 17, 2010

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE